Fred M. Blum (SBN 101586)
fblum@eghblaw.com
Jesper I. Rasmussen (SBN 121001)
jrasmussen@eghblaw.com
Jennifer L. Lallite (SBN 230135)
jlallite@eghblaw.com
EDLIN GALLAGHER HUIE + BLUM
515 S. Flower Street, Suite 10120
Los Angeles, CA 90071
Telephone: (213) 444-7218
Fax: (213) 652-1992

Stuart I. Friedman (Pro Hac Vice to be submitted)
sfriedman@friedmanwittenstein.com
Ivan O. Kline (Pro Hac Vice to be submitted)
ikline@friedmanwittenstein.com
Jonathan D. Daugherty (Pro Hac Vice to be submitted)
jdaugherty@friedmanwittenstein.com
FRIEDMAN & WITTENSTEIN
A Professional Corporation
1345 Avenue of the Americas
2nd Floor
New York, New York 10105
Telephone: (212) 750-8700

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JANUS ET CIE,<br><br>               Plaintiff,<br><br>vs.<br><br>JANICE FELDMAN,<br><br>               Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>  **1. BREACH OF CONTRACT**<br>  **2. BREACH OF IMPLIED**<br>     **COVENANT**<br>  **3. INDEMNITY**<br>  **4. DECLARATORY JUDGMENT**<br><br>JURY TRIAL DEMANDED |

Plaintiff JANUS et Cie ("JANUS"), by and through its attorneys, Edlin Gallagher Huie + Blum and Friedman & Wittenstein, A Professional Corporation, alleges as follows:

## NATURE OF THE ACTION

1.     JANUS is a seller of design-driven furnishings for the outdoors, with its principal place of business in Santa Fe Springs, California.  On May 2, 2016, a controlling interest in JANUS was purchased by Haworth, Inc. ("Haworth"), a manufacturer of office furniture systems and related products, and became part of Haworth's Lifestyle Design family of companies, which includes the Poltrana Frau Group companies ("PFG"). On July 1, 2019, Haworth purchased the remaining interest in JANUS and thereafter owned 100 percent of the company.

2.     Prior to its purchase by Haworth, JANUS was wholly owned by defendant Janice Feldman ("Feldman"), through a trust for which she was the sole trustee. After the  initial transaction, Feldman remained employed by JANUS as its CEO, with duties that remained essentially unchanged and included control and  oversight of all aspects of the business. As the CEO, Feldman in performing her duties was a fiduciary of JANUS.  In the period between May 2, 2016 and July 1, 2019, Feldman, through her trust, retained ownership of 20% of JANUS.

3.     Feldman also provided services, separate and apart from her obligations as the CEO, after the initial transaction pursuant to a written design agreement with JANUS (as Amended and Restated as of August 31, 2016, the "Design Agreement." A copy of the Design Agreement is attached hereto as Exhibit A.).  Under the Design Agreement, if Feldman – apart from her duties as CEO – created any designs that were subsequently approved, she would be entitled to a royalty on sales of the products that were based on such designs. The Design Agreement made clear that Feldman would only be entitled to royalties on products that were based on designs that she created after Haworth's acquisition of JANUS—May 2, 2016—with the further requirement in most cases that Feldman was the <u>sole</u> creator of the design.

4.     JANUS has recently discovered that Feldman, while CEO of JANUS, submitted designs for approval and improperly received royalties on sales of products based on such designs (a) that were completed – and in some cases already in production – prior to the date of the acquisition of JANUS by Haworth; (b) that she did not create "solely" by herself, but rather for which she collaborated with JANUS's design staff to create the design; and (c) that she had no rights to at all, as the designs were actually created – and are currently owned – by Chinese or Southeast Asian furniture manufacturers from which JANUS purchased the furniture.

5.     Feldman – in her dual roles as CEO of JANUS and as a designer claiming royalties – effectively stood on both sides of these transactions, and was thus in a position to conceal her wrongdoing from JANUS and did conceal her wrongdoing.

6.     Upon information and belief, in doing so, she knowingly sought royalties on products relating to designs for which she knew or should have known that no royalty was due, and then used her position as CEO to ensure that such payments were made.  In doing so, Feldman wrongfully diverted funds from JANUS to herself.

7.     Accordingly, JANUS brings this action seeking recoupment of royalty payments wrongly received by Feldman and a declaration that certain designs are not subject to royalty payments going forward.

## PARTIES

8.     JANUS is a California corporation, with its principal place of business located in Los Angeles County, California.   JANUS is a seller of high-end, design driven outdoor furniture, much of which is designed by JANUS's own designers, including Feldman.  JANUS does not manufacture any of its own outdoor furniture products.  Rather, all or substantially all of the furniture it sells is purchased from manufacturers in China and Southeast Asia.

9.     Feldman is a citizen of Nevada and resides in Las Vegas, Nevada. Feldman is the founder of JANUS and ran the company as its CEO until December 31, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

10.    Pursuant to the Design Agreement between JANUS and Feldman, both parties have consented to the personal jurisdiction of this Court.

11.    This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district, and pursuant to the agreement of the parties in the Design Agreement.

## FACTS

**The 2016 Transaction and Feldman's Continued Employment as CEO**

13.    On May 2, 2016, pursuant to a Stock Purchase Agreement dated April 11, 2016, Haworth acquired 80% ownership of JANUS from Feldman's trust for approximately $84.5 million. In 2019, following the exercise of a "put option" by Feldman's trust, Haworth paid Feldman's trust an additional $33 million for the remaining 20% of JANUS.  In total, Haworth paid Feldman, through her trust, approximately $117.5 million for all of the stock of JANUS.

14.    As part of the 2016 transaction, Feldman represented that, except where specifically delineated in schedules, JANUS owned all intellectual property of JANUS. Section 3.20 of the Stock Purchase Agreement provides that**:**

> [u]nless otherwise indicated in Section 3.20 of the Seller Disclosure Schedule, (a) [JANUS] and its Subsidiaries own free and clear of all Encumbrances or possess a license to use, all Intellectual Property owned by JANUS … and (f) … [JANUS] and its Subsidiaries are not required, obligated or under any liability whatsoever, to make any payments by way of royalties, fees or otherwise to any owner licensor of, or other Plaintiff to any Intellectual Property.

15.     Feldman, in her individual capacity or through her trust, had no ownership interest in any existing designs, whether developed or in development, of JANUS at the time of the transaction, and going forward, all such interests belonged to JANUS and not to Feldman.  Thus, under the terms of the Stock Purchase Agreement, and subject to the 20% interest temporarily retained by Feldman's trust, from May 2, 2016 onward, JANUS owned or controlled all of the property, good will, intellectual property and rights to relationships with designers, manufacturers and other third-parties doing business with JANUS.

16.     On May 2, 2016 (the date when the sale of 80% of JANUS to Haworth closed), Feldman also entered into a written employment agreement (the "Employment Agreement") with JANUS, pursuant to which Feldman was employed as the Chief Executive Officer of JANUS.  The Employment Agreement was subsequently revised and restated on July 1, 2019 (the "Amended Employment Agreement"), contemporaneously with the exercise of the "put option" referenced in Paragraph 13, *supra*. As CEO, Feldman, in addition to her other responsibilities, continued to select new products from vendors and manufacturers.  At all relevant times, Feldman as the CEO was a fiduciary of JANUS.

17.     As compensation for her employment, Feldman received an initial salary of $490,000 in 2016.  Feldman's salary remained the same until 2020, Feldman's final year, during which she was paid $980,000 as CEO of JANUS pursuant to the Amended Employment Agreement.

18.     Both before and after its restatement, Section 4.04 of the Employment Agreement and Amended Employment Agreement, as well as the laws of the State of California, provided that all intellectual property conceived of by Feldman in the course of her employment was owned by JANUS. The original Employment Agreement provided as follows:

> All business ideas and concepts and all inventions, improvements, developments and other intellectual property

made or conceived by Executive, either solely or in collaboration

with others, during the Employment … and relating to the

business or any aspect of the business of the Corporation… or to

any business or product the Corporation …. is actively planning

to enter or develop, shall become and remain the exclusive

property of the Corporation….

19. The quoted passage was substantially unchanged in the Amended Employment Agreement.

20. In addition, Section 4.04 confirmed that there was no intellectual property – including industrial designs – for which Feldman had any ownership interest as of the date it was entered into, May 2, 2016.

21. Feldman's employment with JANUS ended on December 31, 2020.

**The Design Agreement**

22. Effective the same day as the Employment Agreement (May 2, 2016), Feldman also signed the original Design Agreement, which was Amended and Restated on August 31, 2016. The parties to the Design Agreement were Feldman, JANUS, and PFG.

23. In contrast to the Employment Agreement and Amended Employment Agreement, under which any designs created, selected, or improved upon by Feldman in the course of her employment belonged to JANUS, the purpose of the Design Agreement was to compensate Feldman for services separate and apart from those as the CEO, but only if she designed furniture sold by JANUS that satisfied certain requirements.

24. Specifically, the Design Agreement contemplated that Feldman could create three categories of designs for which she would be separately compensated: 1) Original Designs, meaning "original Designs created by [Feldman] from [May 2, 2016] and intended for Products to be manufactured, marketed, and distributed by" JANUS; 2) Conversion Designs, meaning "upon request of the CEO of Poltrana Frau Group...,

… Designs intended for Products based on existing products, product designs or concepts … owned by, or licensed to Poltrana Frau Group's affiliates … that can be converted or manufactured for outdoor use"; and 3) Derivative Designs, meaning "Designs based solely upon Accepted [Original] Designs and Conversion Designs." (Design Agreement § 1).

25.     Feldman was to be paid a royalty of 4% in perpetuity on product sales based on Original Designs, and 2% on product sales for ten years based on Conversion Designs. Royalties for Derivative Designs were paid based on whether the design was derivative of an Original Design or a Conversion Design. (Design Agreement § 5(a)). In other words, if a Derivative Design stemmed from an Original Design product sale it entitled Feldman to a 4% royalty in perpetuity; and, if the Derivative Design stemmed from a Conversion Design product sale it resulted in a 2% royalty for 10 years.

26.     Feldman's designs were to be created independent of her work as CEO of JANUS. Further, Feldman represented and warranted in the Design Agreement that "Original Designs to be provided by [Feldman] are **original creations and created solely by [Feldman], and no third parties (including no other designers) will have contributed to the creation** of such Original Designs." (Design Agreement § 9(ii)). (Emphasis supplied.)

27.     Feldman also represented and warranted that she was not taking others' intellectual property in making Original Designs. Specifically, Feldman represented in the Design Agreement that "the Original Designs, to your knowledge, at the time of creation will not violate any intellectual property right of any third party, including copyright, patent, trade dress, trade secret or industrial design." (Design Agreement § 9(iii)). Accordingly, to qualify as an Original Design, the design had to be created "solely" by Feldman and without the collaboration or contribution of other designers at JANUS or external of JANUS, including designers of the Chinese and Southeast Asian manufacturers from which JANUS purchases all of its product.

///

28.     Feldman agreed to indemnify JANUS for any losses arising from a breach of these representations and warranties, **"including but not limited to attorneys' fees"**. (Design Agreement § 9 (Emphasis supplied)).

29.     Under the Design Agreement, Feldman is required to submit her putative designs to PFG for approval prior to their development into products.  PFG makes the determination whether the design is appropriate for JANUS' product line but does not do an investigation of whether a particular design was or was not created "solely" by Feldman, owned by a third party, or pre-dates May 2, 2016.  Rather, under the terms of the Design Agreement, those requirements are expressly warranted and represented to be true by Feldman, and PFG and JANUS relied on her veracity in that respect.

**Royalty Disputes**

30.     Following the signing of the Design Agreement, from the outset of the calculation of royalties owing to Feldman, Feldman—the CEO of JANUS—began to dispute the sufficiency of the royalty payments by JANUS and aggressively campaigned for the payment of more and more royalties to her.

31.     Like many companies, JANUS tracks its products by "stock keeping unit" numbers, or "SKUs".  By early 2019, Feldman herself, in an effort to increase the amount of royalties she was receiving, provided, or caused her subordinates at JANUS to provide, a SKU list of all products sold by JANUS for which she asserted a royalty was due her.  Through this effort, Feldman, in violation of the terms of the Design Agreement and the duties she owed Janus, was able to push through and increase further the number of products on which JANUS would pay royalties to her. Feldman thereby was able to improperly obtain royalty payments on a list of product SKUs compiled by herself and people who reported to her as JANUS's CEO, and, based on designs that were plainly outside the scope of compensable designs under the Design Agreement as set forth below.

///

///

**Product Development at JANUS and Feldman's Royalties**

32.   Product development at JANUS generally falls into three broad categories – "Factory Based OEM" (original equipment manufacturers); "Customized Projects"; and "Own Design Manufacture."

**Factory Based OEM Development**

33.   Factory-based OEM development relates to furniture purchased from Asian manufacturers in the form and design substantially developed by the foreign manufacturers themselves.  JANUS (both before and after Feldman sold the company to Haworth) would send employees to Chinese and Southeast Asian furniture manufacturers to view products currently on offer in such manufacturers' product catalogues or showrooms. These trips were colloquially referred to within JANUS as "shopping trips." JANUS would choose products on a "shopping trip" driven primarily by not only aesthetic design, but also time to market and current trends.

34.   After a "shopping trip" in Asia, JANUS designers, including Feldman, would often make minor "color & finishing" changes to the product and apply JANUS branding. For example, an arm on a chair that was squared might be rounded, a "natural" rattan piece might be finished differently, a satin finish might be made gloss or flat, or a darker colored article might be lightened.  The basic design of the furniture, however, was created by the third-party manufacturer and ownership rights to the underlying design were often, although not always, retained by that manufacturer.  By buying out of a catalogue or off a showroom of an existing manufacturer and making only minor changes, JANUS could in some cases shorten its time from concept to sales to a mere six months.

35.   The "color & finishing" changes are an important part of the OEM product development cycle. Although they do not customarily provide JANUS with intellectual property ownership of the manufacturer's underlying design, they do provide JANUS with a product that it can exclusively distribute.

///

36.     An example of this type of product is JANUS's Conic series. With respect to this product, JANUS's Vice President of Product Development and Design made a trip to the manufacturer Parklane in Southeast Asia. There, she viewed and evaluated various products from Parklane's catalogue. JANUS made a few design tweaks with respect to color and finish and then had an exclusive product it could distribute under the JANUS name. However, Parklane continues to sell the underlying design in other colors and finishes to other buyers and retains the intellectual property rights to the basic design.

37.     Accordingly, neither JANUS nor Feldman own this design. Parklane does. JANUS owns only an exclusive distribution right for a specific color and finish, and Parklane was the original designer of the Conic line. However, Feldman has claimed and been paid royalties on product sales by JANUS of the Conic line and design.

38.     In such factory-based OEM cases, the underlying product design was the Chinese or Southeast Asian manufacturer's, not JANUS's and certainly not Feldman's. Indeed, in response to an intellectual property audit request by JANUS, manufacturers such as Yamakawa, Primazen, and Parklane have confirmed to JANUS that they own the designs for many products for which Feldman has claimed – and been paid – royalties.

39.     Moreover, such products, where Feldman only made "color and finishing" changes after a "shopping trip," are not "created *solely* by" Feldman, as the Design Agreement mandates.

40.     Despite knowing that she did not "solely" create these designs and despite knowing that designs obtained on "shopping trips" were the intellectual property of the manufacturers, Feldman nonetheless submitted, or caused her subordinates to submit on her behalf, a significant number of these designs to JANUS for royalty payments on sales of products based on them and collected such royalties.

///

///

**Customized Project Development**

41.     Customized Projects are special, one-off designs created by JANUS's Customs Department. For example, a customer may have a private article of furniture, such as an antique armoire, on which they would like to base a JANUS product. Or a customer may want a "proprietary" version of an existing JANUS or non-JANUS product, such as a hotel ordering a specific, unique version of a JANUS product for its properties. These types of custom products are a market differentiator for JANUS from its competitors, and JANUS will develop these types of projects if the customer commits to purchasing sufficient volume. Custom products developed in this way are not originally sold as part of the regular JANUS catalogue.

42.     An example of this type of project is the Akuu series. This series started as a custom product design based on a Japanese client's idea. Once that initial commissioned custom product was sold, JANUS's sales staff decided that the products could be developed into a design line and sold. Although JANUS owns the intellectual property for this design, the actual work was performed by the Customs Department in consultation with the customer and the factory and based on a pre-existing design submitted to JANUS by the customer.

43.     Feldman has wrongfully claimed and been paid royalties on the Akuu series even though these products were not based on designs "solely created" by Feldman. Like all custom designs, JANUS' Customs Department was heavily involved in the design process for Akuu, and the original design concept was not even JANUS's; it was the Japanese customer's. Feldman has wrongfully claimed and been improperly paid royalties on other custom project designs that she was not involved in, much less sole creator of.

**Own Design Manufacture Projects**

44.     Own Design Manufacture Projects are totally new design concepts, with new materials, color, finishing and new specifications. They are created from scratch.
///

45.     Where these designs are "created solely by" Feldman, and post-date May 2, 2016, they would meet the definition of "Original Designs," and Feldman may be entitled to royalties on sales of such products resulting therefrom.

46.     However, when such designs are not "created solely by" Feldman, for example where JANUS's other designers participated or collaborated in the creation of the design, or when such designs existed as of May 2, 2016, then, under the terms of the Design Agreement, Feldman is not entitled to royalties.

47.     Own Design Manufacture Projects are a significant undertaking and require a lengthy process. The initial design process itself – market intelligence, portfolio analysis, brainstorming, ideation, manufacturing – and all the other steps that lead to a design control document that can be sent to a factory, typically requires two to four months. This is the point when the designer submits her or his design.

48.     After that, five to seven months is typically spent with the factory (usually in Asia) critiquing the design, its manufacturing process, providing samples, making necessary changes to either the design or samples to ensure that the product can be manufactured at JANUS's required quality, and then finalizing "Design Sign off." This triggers a system entry in JANUS's system called the "Set-up date."

49.     Following all of that, another seven months is typically spent in the "Pre-Launch" phase creating SKU numbers, purchase orders, artwork, tear sheets, website files, inspection criteria documents and product data sheets. In the ensuing "Launch" phase, the products are added to showrooms and stores.

50.     This means that from the time a designer submits a design until the first sales are recorded, typically at least 12-14 months have elapsed. Critically, during this time period, and all these stages, the creative design process is engaged.  In many instances, as stated above, the process is collaborative and multiple designers employed by JANUS contribute to the ultimate design of the product.

///

///

**Products Designed in Whole or in Part Prior to May 2, 2016**

51.    The Design Agreement expressly excludes designs that predated the May 2, 2016 acquisition of JANUS by Haworth from eligibility for royalty payments. (Design Agreement § 1; see also Employment Agreement and Amended Employment Agreement § 4.04). Feldman was aware of this critical restriction from the time she signed the agreement.

52.    Most of JANUS' products fall into various product lines or "families." The basic design of products within a product line or family is common to all products in the line.  That is, a product line may consist of chairs, chaises, tables, side tables and more.  All share the same basic design and "go together."  Thus, the first design may be a chair, then a chaise will adopt that same "matching" design, then a table, and so on.

53.    The development schedule for Original Designs outlined above means that it is a near certainty that the design for any product with sales commencing within a year or so following the May 2, 2016 design "cut off" date was not an Original Design within the meaning of the Design Agreement, as the design would have in almost all such cases existed prior to that date. Furthermore, designs with a "Set-up Date" within five to seven months or so following the May 2, 2016 design "cut off" were, depending on the specific project timeline, for the same reason very likely not Original Designs entitling Feldman to royalties under the Design Agreement.

54.    As an example of the numerous products for which the design unquestionably existed prior to May 2, 2016, Feldman improperly requested and was paid royalties on products such as the Arbor Club Chair (Seashell), with a Set-up Date of October 23, 2014, and a first sale date of March 29, 2016.  Both dates predate the earliest creation date for a design for which Feldman could be entitled to royalties under the Design Agreement.

///

///

55.     Despite knowing that she was not entitled to royalties on designs pre-dating May 2, 2016, Feldman still submitted and received royalties on sales of the Arbor Club Chair which had its first sales on March 29, 2016.

56.     As another example, the Niche Armchair (Bronze) had a Set-up Date of March 7, 2016, and a first sale date of July 11, 2016. The Set-up Date makes plain that Feldman was not entitled to royalties on this product, and yet Feldman submitted the design of the product and was paid royalties on sales of this product.[1]

57.     Of the many product lines for which Feldman claimed and was paid royalties, Plaintiff has identified, at the time of the filing of this Complaint, more than 200 with a Set-Up Date before the effective date of May 2, 2016.  Feldman improperly claimed entitlement to, and received royalties on, many additional products where, while the "Set-up Date" and first sale date were subsequent to May 2, 2016, the designs were created prior to May 2, 2016.

58.     Upon information and belief, Feldman, as CEO of JANUS, knew that these products were designed before Haworth acquired JANUS and Feldman knew that under the Design Agreement JANUS was only to pay her royalties on designs created by her after the date of the original Design Agreement (May 2, 2016). Nonetheless, Feldman wrongfully submitted and was paid royalties on all these products.

**Designs Not Created Solely by Feldman**

59.     In addition to the requirement that royalty producing designs post-date May 2, 2016, pursuant to the Design Agreement Feldman is only entitled to a royalty payment when she is the "sole" designer.

60.     In numerous – and, indeed, JANUS believes in the majority of cases – Feldman used other designers employed by JANUS to contribute to her putative designs.  In some cases, she would sketch out a design and have a staff member at JANUS put the design into a CAD (computer-aided design) drawing.  Sometimes, the

---

[1] In addition, this product was a Custom Design Product for which Feldman would not be entitled to royalties in any event as she was not the "sole" designer.

other designers would fill in or supplement design features in order to complete the CAD drawing.

61.     In most cases, Feldman would give a JANUS designer a very rudimentary sketch or merely a concept, sometimes referred to as a "doodle", and that designer would actually design the product around or based on that doodle or concept. In such instances, while Feldman may have contributed to the design of the product – indeed, she may have been the principal contributor to the design – she was not the "sole" designer, and because other designers at JANUS contributed to the creation of the design, such designs do not satisfy the Design Agreement's requirements for royalties.

62.     Under the Design Agreement, Feldman is not entitled to a royalty payment when JANUS makes sales of products that are based on designs not created solely by her.

63.     Of the Own Design Manufacture designs for which Feldman was paid royalties, many were not "solely" designed by Feldman because other designers at JANUS provided material contributions to Feldman's sketch or concept.

64.     In addition, Feldman submitted Design Approval Forms for designs which were created by other designers. For example, the Rondo line of products was a factory off-the-shelf design that was refined and developed by JANUS's design team. Nonetheless, Feldman submitted a Design Development Form representing that she was the designer of Rondo line. In another example, Feldman submitted a Design Approval Form for Rattan Translation Products which identified her as the designer but failed to identify Gabellini Shepard as the designer of the underlying Fibonacci line. Gabellini Shepard designed the Fibonacci line and was paid royalties on non-Rattan versions of the furniture. Not only were these designs not solely created by Feldman, but the original design concepts were created by other persons.

65.     Upon information and belief, Feldman knew, or certainly should have known, that the designs referenced in the previous paragraph were not solely created by her at the time that she requested royalty payments for them.

66. Finally, as set forth above in paragraphs 33 to 40, many JANUS products are based on designs of Chinese or Southeast Asian manufacturers. In such cases, JANUS acquired a right to sell a specific version of the design created and owned by such manufacturers. Such designs, purchased from third parties, by definition are not and could not have been created solely by Feldman.

67. Upon information and belief, Feldman knew, or certainly should have known, that the products based on designs of third-party manufacturers were not solely created by her at the time that she requested royalty payments for them.

**JANUS Product "Refreshes"**

68. In addition to these main development categories, JANUS sometimes would "refresh" an old product line in a newer form. For example, the Koko line was designed many years ago, and had also not been sold in its original form for many years. In 2020, JANUS refreshed this line as "Koko II Alta." "Koko II Alta," and all other "Alta" products at JANUS, are the same as the original Koko line, except that the products have been made a little higher to make it more appropriate and accessible for use in senior living facilities, where residents may have mobility or disability issues.

69. Despite knowing that the Koko II Alta was simply the original Koko design made slightly higher, Feldman claimed and was paid royalties on numerous Koko II Alta products.

70. Upon information and belief, Feldman also claimed royalties on other "refresh" products, in and outside the "Alta" line, such as the Niche line (with products sold as early as 2014 – Feldman claimed and was paid royalties on it) and the derivative Niche Alta line.

**Cushions**

71. As part of the royalty dispute, Feldman also claims that she is entitled to a royalty on cushions as a standalone product, even when such cushions are sold separately from the article of furniture and are not structurally part of the article, meaning that the piece of furniture may be purchased and used entirely without

1   cushions.  For example, some chairs may be used with or without a cushion, and the

2   cushion may be purchased (or not purchased) at the option of the customer.

3       72.    Feldman is not a designer of cushions, and has never designed cushions,

4   within the meaning of the Design Agreement.

5   **Feldman Was in a Superior Position from JANUS to Recognize her**

6   **Wrongful Course of Conduct, and Actively Prevented JANUS from**

7   **Detecting her Breaches and JANUS' Injuries**

8       73.    Feldman was the founder of JANUS and its CEO from its inception

9   through December 31, 2020.  In her position, and with her historical knowledge of the

10   company, its business and products, Feldman was in a vastly superior position than

11   either others at JANUS or  Haworth, as the new majority stockholder of JANUS, or

12   PFG, a new affiliate of JANUS, to know that many of the designs she submitted as

13   Original, Conversion and Derivative Designs did not qualify as such under the Design

14   Agreement, and that the royalty payments she received—out of the coffers of JANUS,

15   of which she was CEO, should not have been paid to her.

16       74.    In many respects, Feldman – as CEO of JANUS and as a designer under

17   the Design Agreement – stood on both sides of her royalty contract with JANUS.

18       75.    Upon information and belief, Feldman knowingly submitted both designs

19   and requests for payment of design royalties on products that she knew to be outside

20   the scope of the Design Agreement.

21       76.    By not sharing her superior knowledge, including her historical

22   knowledge of designs created prior to May 2, 2016, designs created in collaboration

23   with other JANUS designers, designs originated by customers as "custom" products,

24   and designs created and even owned by Chinese and Southeast Asian manufacturers,

25   Feldman actively prevented JANUS, Haworth (JANUS's owner) and PFG (JANUS's

26   affiliate) from discovering her wrongdoing.

27       77.    Accordingly, upon information and belief, at the time Feldman wrongfully

28   submitted her putative designs as qualifying for royalty payments under the Design

Agreement, as well as when she compiled, or caused to be compiled, lists of SKUs based on such designs and claimed and received payments on sales of such products, she knew and intended that JANUS, PFG, and Haworth would neither discover nor act on her false submissions.  Feldman alone had knowledge of both the requirements for a design to be compensable under the Design Agreement and the timing and creators of the designs that she was submitting. Thus, Feldman prevented JANUS, PFG, and Haworth from discovering her wrongful conduct by not disclosing the true facts relating to such designs which only she knew.  Accordingly, Feldman alone was in a position of knowledge and authority to inform JANUS, Haworth, or PFG, JANUS's affiliate, of her wrongful conduct.

78.     Because of Feldman's concealment, JANUS, PFG, and Haworth could not and did not detect that Feldman was submitting designs in violation of the Design Agreement's representations and warranties.

79.     Because Feldman prevented it from doing so, JANUS could not and did not comprehend that it had been harmed by Feldman.

80.      Indeed, because Feldman was the CEO of JANUS and a trusted fiduciary of the company, it would never even have occurred to JANUS, PFG or Haworth to question her conduct.

81.     Because Feldman directed it to, JANUS made royalty payments on designs that were not entitled to such payments under the Design Agreement.

82.     Feldman knowingly profited from JANUS's ignorance, which she herself had caused.

83.      Only after Feldman left JANUS, were JANUS (other than previously though Feldman herself as CEO), Haworth and PFG able to discover, and did eventually discover, the fact and extent of Feldman's wrongful conduct.  Thus, Haworth in conjunction with JANUS's new CEO, its CFO and its Vice President of Product Development and Design conducted a systematic review during the year and a half following Feldman's departure from the company.  By comparing the results of

product offering dates, auditing vendor relationships, and reviewing the sales history of products based on Designs that resulted in royalty payments under the Design Agreement, JANUS, PFG, and Haworth came to understand and discover Feldman's wrongful conduct.

84.    Feldman continues to breach the Design Agreement and cause harm to JANUS by continuing to claim royalty payments to which she is not entitled each and every quarter.

**FIRST CLAIM FOR RELIEF**

**(Breach of The Design Agreement,**

**Including Breach of Warranty and Representation)**

85.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

86.    The Design Agreement is a valid and enforceable contract.

87.    JANUS has performed all of its obligations under the Design Agreement.

88.    In the Design Agreement, Feldman warranted and represented that "Original Designs to be provided by [Feldman] are original creations and created solely by [Feldman], and no third parties (including no other designers) will have contributed to the creation of such Original Designs." (Design Agreement § 9(ii))."

89.    Feldman breached this representation and warranty by submitting and requesting payment for numerous designs that were not created solely by her.

90.    Feldman also warranted and represented that "the Original Designs, to your knowledge, at the time of creation will not violate any intellectual property right of any third party, including copyright, patent, trade dress, trade secret or industrial design." (Design Agreement § 9(iii)).

91.    Feldman breached this representation and warranty by submitting and requesting payment for numerous designs as to which the rights were owned by third parties.

///

92.     The Design Agreement further provided that, for a design to qualify as one for which Feldman could be entitled to compensation, it had to be created by Feldman after May 2, 2016 (the date of the original Design Agreement). (Design Agreement Section 1). In addition, Feldman represented and warranted in Section 9 of the Design Agreement that the designs to be submitted by her would qualify as Original Designs for which she was entitled to compensation, thereby impliedly representing and warranting that all such designs would post-date May 2, 2016.

93.     Feldman breached the requirement that designs post-date May 2, 2016, and breached here representation and warranty, by submitting and requesting payment for numerous designs that pre-dated May 2, 2016.

94.     Feldman used her position as CEO of JANUS to cause JANUS to make royalty payments on designs for which, upon information and belief, Feldman knew or should have known she was not entitled to royalties because they were not created solely by Feldman; because third parties (including, in some cases, other JANUS designers) contributed to the creation of such Original Designs; because the design was actually owned by the manufacturer in Southeast Asia, a third party; and/or, because the design was created prior to May 2, 2016.

95.     Feldman used her position as CEO of JANUS and her superior knowledge to prevent JANUS and its owner, Haworth, from discovering that Feldman was causing it to make royalty payments in violation of the Design Agreement, and thereby damaging JANUS.

96.     Feldman profited by causing JANUS to make royalty payments while not aware of her breaches of contract.

97.     As a direct and proximate result of Feldman's breaches, Plaintiff has been damaged in an amount which Plaintiff calculates currently exceeds $1.5 million.

///

///

///

1

2

**SECOND CLAIM FOR RELIEF**

**(Breach of Implied Covenant – Duty of Good Faith and Fair Dealing)**

3      98.   Plaintiff incorporates by reference the allegations contained in all

4   preceding paragraphs of this Complaint.

5      99.   Feldman was obligated to exercise her rights under the Design Agreement,

6   including with respect to the submission of Designs for approval or payment, in good

7   faith and by dealing fairly with JANUS.

8      100.   Feldman breached her duty of good faith and fair dealing by, among other

9   things, abusing her position as CEO of JANUS and her superior knowledge, to cause

10   JANUS to pay royalties on Designs which were outside the scope of Design

11   Agreement, and for which she had no entitlement to royalties, and while doing so

12   causing JANUS to be unable to discover or act upon her wrongful conduct.

13      101.   Feldman's conduct was designed solely to further her own interests and

14   was undertaken in total disregard to the rights and interests of JANUS.

15      102.   By virtue of the above, JANUS is entitled to recover damages against

16   Feldman for all amounts she wrongfully received with respect to Designs outside the

17   scope of the Design Agreement.

18

19

**THIRD CLAIM FOR RELIEF**

**(Indemnity)**

20      103.   Plaintiff incorporates by reference the allegations contained in all

21   preceding paragraphs of this Complaint.

22      104.   Pursuant to Section 9 of the Design Agreement, Feldman indemnified

23   JANUS for any and all damage, including attorneys' fees, "incurred" by JANUS for

24   her breach of her warranties or representations.

25      105.   Feldman breached her warranties and representations that her various

26   designs were "Original Designs" or otherwise entitled her to a royalty payment because

27   they were, *inter alia*, not created solely by Feldman, not created after May 2, 2016,

28   and/or belonged to Chinese and Southeast Asian manufacturers from which the

1    products were purchased by JANUS.

2    106.   Accordingly, JANUS is entitled to recover its damages, including

3    repayment of wrongfully paid royalties to Feldman, its "attorneys' fees" and all its

4    other costs.

5                          **FOURTH CLAIM FOR RELIEF**

6                              **(Declaratory Judgment)**

7    107.   Plaintiff incorporates by reference the allegations contained in all

8    preceding paragraphs of this Complaint.

9    108.   Many designs submitted by Feldman for which she received payment

10   were wrongfully submitted and Feldman was not entitled to be paid royalties on them

11   under the Design Agreement.  On some of these designs, Feldman claims she is entitled

12   not only to retain royalty payments already paid, but also to be paid royalties in

13   perpetuity (even after her death to her trust)

14   109.   Additionally, cushions that are not structurally part of the article of

15   furniture and are purchased (or not purchased) at the customer's option are not

16   "designs" within the meaning of the Design Agreement.

17   110.   Feldman asserts that she is entitled to payment of royalties on both designs

18   wrongfully submitted, as well as on cushions, in some cases in perpetuity.

19   111.   As a direct and proximate result of the above recited facts, Plaintiff is

20   entitled to a declaration that Feldman is not entitled to any future royalty payments on

21   any design wrongfully submitted or on any separately sold cushions.

22

23        **WHEREFORE**, Plaintiff demands judgment as follows:

24   1.    An award of damages to Plaintiff in an amount to be determined at trial,

25   including but not limited to recovery of royalties wrongfully paid to Feldman, which

26   Plaintiff calculates currently exceeds $1.5 million, together with interest;

27   2.    An award of damages pursuant to the indemnity provision in Section 9 of

28   the Design Agreement, including repayment of wrongfully paid royalties, plus the

damages incurred by JANUS in bringing this action, including its attorneys' fees as expressly provided therein;

3.      A declaration that Feldman is not entitled to any future royalty payments on designs for which she is not entitled to the payment of royalties under the Design Agreement.

4.      Awarding such other and further relief as this Court deems just and proper.

DATED: November 15, 2022

*/s/ Fred Blum*
Fred Blum (SBN101586)
Jesper I. Rasmussen (SBN121001)
Jennifer L. Lallite (SBN230135)
**EDLIN GALLAGHER HUIE + BLUM**
515 S. Flower Street, Suite 10120
Los Angeles, CA 90071
Telephone: (213) 444-7218
Fax: (213) 652-1992

*and*

**FRIEDMAN & WITTENSTEIN**
A Professional Corporation
Stuart I. Friedman
Ivan O. Kline
Jonathan D. Daugherty
1345 Avenue of the Americas
2nd Floor
New York, New York 10105
Telephone: (212) 750-8700

COMPLAINT